IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEIF HENRY,<br><br>       Plaintiff,<br><br>   v.<br><br>CITY OF ALLENTOWN and CHIEF ROGER<br>MACLEAN,<br><br>       Defendants. | CIVIL ACTION<br>NO. 12-1380 |

## MEMORANDUM

**SCHMEHL, J.**                                                    **December 5, 2013**

       This action grows out of multiple aspects of Plaintiff's experience as a police officer employee of Defendants. Plaintiff's second amended complaint asserts four counts: a race discrimination claim, a procedural due process claim, a claim for violation of the Rehabilitation Act (RA), 29 U.S.C. §701 *et seq.*, and a claim for RA-related retaliation. Defendants have moved to dismiss, and for the reasons that follow, the Court will grant the motion, partly with and partly without prejudice.


Factual and Procedural Background

       Plaintiff Leif Henry entered the employ of Defendant City of Allentown as a police officer in 1998. At some point he was assigned to the K-9 unit and worked with a dog named Falko; Plaintiff alleges that as of September 2010, he was "in charge of supervising and running the day to day operations and training of the k-9 unit." Second Amended Complaint at ¶18. Sadly, over the remainder of 2010, Falko suffered a series of medical problems and was euthanized in early December.

Later in December, a local businessman donated a dog to the union with the understanding that it would be assigned to Plaintiff to replace his previous dog. According to Plaintiff, he then took possession of the dog and left a message regarding the donation for his superior, who did not respond. Plaintiff then contacted the union president, told Plaintiff that, according to Defendant Chief of Police Roger MacLean, he was to hold onto the dog while the department sorted things out. On December 23, Plaintiff was told that an investigation was underway and that he was to report for an interview on December 27, which he did. Plaintiff avers he then spoke with Chief MacLean on December 30; according to Plaintiff, Chief MacLean was angry about how the donation transpired, either because he was not directly involved or because the donation was supposed to be to the City rather than to the union, or some combination thereof. Although Plaintiff was initially informed that he could begin working with the new dog in early January, he was subsequently barred from several K-9 training sessions during that month, and on January 27, Plaintiff's superior instructed him to turn over the dog for assignment to another officer. According to Plaintiff, the investigation that occurred surrounding the dog donation in December 2010 has never been officially closed. Though without a dog, Plaintiff remained technically assigned to the same unit until May 26, 2011, when he was reassigned to a new platoon and steady night shifts effective June 1, 2011, purportedly because his presence might undermine the new dog's obedience to his assigned officer.

On June 4, 2011, after Plaintiff's reassignment to night shift, he began to suffer from medical issues including migraines, fatigue, delays in cognition and dexterity, weakness on his right side, elevated blood pressure, and disorientation. Plaintiff's doctor

evidently concluded that he was unable to work night shift because of these ailments, and on August 15, 2011, Plaintiff submitted a doctor's recommendation that he be reassigned to day shift. Plaintiff avers that on several occasions later that month, Chief MacLean made comments to third parties both verbally and by text message to the general effect that he was extremely reluctant to accommodate the medical needs of Plaintiff and others because he viewed these medical requests as merely an attempt to shirk duty that make it difficult for him to supervise and schedule the department. Beyond the animus these comments display, Plaintiff alleges Chief MacLean's discussion of his medical request with third parties constitutes disclosure of his confidential medical information. As of October 17, 2011, Plaintiff was reassigned to day and middle shifts to accommodate his medical issues.

In September 2011, Plaintiff was the subject of an unrelated internal affairs investigation related to supplemental employment outside the department. According to Plaintiff, other employees with outside work were not investigated, and the investigation was intended to harass him.

Plaintiff filed this suit March 19, 2012, and filed a first amended complaint four days later, before any response by Defendants. Defendants filed a motion to dismiss, and the Honorable Lawrence F. Stengel, to whom this case was previously assigned, granted the motion, dismissing Counts I and II without prejudice, Count III with prejudice as to Defendant MacLean, and Count IV with prejudice as to MacLean but without prejudice as to the City.[1] In accordance with Judge Stengel's order, Plaintiff filed a second

---

[1] The complaint at that time contained the same counts as the current version except that Count IV was styled as retaliation under the ADA rather than the RA. Judge Stengel's order did not address Count III as to the City because at that time Defendants' motion did not expressly challenge it.

amended complaint on January 18, 2013, and Defendants again moved to dismiss. The case was reassigned to the undersigned on July 30, 2013.[2]

Discussion

Plaintiff's second amended complaint has four counts. Count I states a claim for race discrimination under 42 U.S.C. §1981. Count II alleges a procedural due process claim regarding Plaintiff's reassignment out of the K-9 unit. Count III asserts a violation of the RA, focusing on discrimination but conceivably including failure to accommodate. Count IV presents an RA retaliation claim. Defendants have moved to dismiss all counts for failure to state a claim.

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the grant of a motion to dismiss is usually without prejudice, a District Court may exercise its discretion and refuse leave to amend if such amendment would be futile, particularly when a plaintiff has had multiple opportunities to improve the pleadings. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434-35 (3d Cir. 1997).

---

[2] Shortly before the entry of this memorandum and the accompanying order, Plaintiff obtained new counsel who has sought leave to amend the complaint yet again; the Court denies that motion by a separate order.

<u>Count I</u>

Plaintiff has the initial burden of establishing a prima facie case for his race discrimination claim under 42 U.S.C. §1981. *Coleman v. City of Philadelphia*, 80 F. App'x 279, 283 (3d Cir. 2003). To meet that burden, he must show: "(1) [he] is a member of a protected class; (2) [he] satisfactorily performed the duties required by [his] position; (3) [he] suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise to an inference of discrimination." *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 259 (3d Cir. 2006). The motion to dismiss centers on the fourth element, and Plaintiff fails to satisfy it as he did in the previous version of his complaint.[3]

First, Plaintiff maintains allegations that his superiors instructed him to perform menial or demeaning tasks and serve as a translator when dealing with Spanish speakers. Judge Stengel rightly discounted those allegations in his earlier opinion:

> That Henry was asked to retrieve his supervisor's lost pen and translate conversations with Hispanic community members is not revealing of discriminatory animus, *see, e.g.*, *Vasquez v. Navistar Int'l Transp.*, 2:09-CV-434 JD, 2012 WL 1095223, at *6 (N.D. Ind. Mar. 20, 2012) ("Asking [a] bilingual person . . . to translate a conversation is not evidence of discriminatory intent"), and in any event, these allegations are wholly unconnected to Henry's reassignment and thus are not "circumstances that raise an inference of discriminatory action," *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

---

[3]The Court further notes the potential lack of an adverse employment action. "An 'adverse employment action' [for discrimination purposes] is one that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.' Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions. *Langley*, 186 F. App'x at 260 (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir.2001)). The parties' briefs do not fully address the presence or absence of an adverse action with respect to Count I, so the Court will not consider the issue at this stage.

*Henry v. City of Allentown*, 5:12-CV-1380, 2013 WL 81394, at *3-4 (E.D. Pa. January 7, 2013). It is worth reiterating the lack of linkage between these facts and Plaintiff's reassignment: Plaintiff's own account of the facts as represented in the second amended complaint tells the story that he was moved out of the K-9 unit, rightly or wrongly, because of conflict surrounding the donation of a replacement dog. Instances of being told to take a car to be washed or being asked if he knew another Hispanic officer are similarly unconnected with the reassignment and do not indicate discrimination.

Plaintiff has attempted to improve upon his previously unspecific allegations that "similarly-situated non-members of the protected class were treated more favorably." *Langley*, 186 F. App'x at 259. "[C]omparator employees must be similarly situated in all relevant respects," the determination of which "takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1645 (U.S. 2012). The infractions involved must be quite similar. *See Carter v. Midway Slots & Simulcast*, 511 F. App'x 125, 128 (3d Cir. 2013), *cert. denied*, 12-10588, 2013 WL 2416806 (U.S. Oct. 7, 2013) (finding comparators insufficiently similar where they were disciplined for attendance issues rather than sleeping on the job, and where they did not share the same supervisor). The comparators should also have similar disciplinary records to the plaintiff. *See Coleman v. Pennsylvania State Police*, 11-1457, 2013 WL 3776928 (W.D. Pa. July 17, 2013) (citing *Haskins v. Christiana Care Health Serv.*, 701 F. Supp. 2d 623, 629 (D. Del. 2010)). Nevertheless, comparators who committed offenses that were different but of "comparable seriousness" may satisfy the plaintiff's burden. *Opsatnik v. Norfolk S.*

*Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)).

Plaintiff primarily points to two white K-9 officers, one who lost a dog and one who drove a city vehicle to Texas with an unauthorized passenger, both of whom were suspended but not reassigned out of the K-9 unit. While the offenses need not be identical if they are more serious, Plaintiff has not alleged enough to consider these examples similar. Did these officers have the same supervisor as Plaintiff? Were their disciplinary records otherwise similar? Moreover, suspension hardly seems a less severe consequence than reassignment, and it is nearly impossible to determine how the infractions compare because the nature of Plaintiff's own infraction is unclear; indeed, the most sensible reading of the second amended complaint is that Plaintiff contends he did not commit any infraction. Plaintiff lists nine other alleged comparators with even less detail, and what little information he offers marks their situations out as involving either dissimilar infractions (in some cases not infractions at all, but rather medical issues, etc.) or consequences very similar to Plaintiff's own (several of the offered comparators received reassignments).

Count I, therefore, will be dismissed; the dismissal will be without prejudice to give Plaintiff an additional opportunity to provide sufficient detail regarding the alleged comparators.

Count II

Plaintiff's second count alleges a violation of procedural due process with regard to his reassignment, which he argues qualifies as a loss of the property interest that police

officers of third-class cities have in their employment. In both the second amended complaint itself and in his brief opposing summary judgment, Plaintiff continues to suggest that his reassignment out of the K-9 unit constitutes being "<u>terminated</u> from **his position as K-9 officer**." Plaintiff's Brief at 17 (emphasis in original). That perspective has already been rejected by Judge Stengel's prior opinion, which rightly defined the issue as whether Plaintiff's allegations support an inference that his reassignment was a constructive demotion.[4] Nothing added in the second amended complaint supports such an inference.

Constructive reduction in rank may be shown by a change in pay, assignment of duties typical of lower rank, substantially reduced responsibilities, or loss of rank-based privileges. *See Clark v. Twp. of Falls*, 890 F.2d 611, 618 (3d. Cir. 1989). Assignment to different duties that are merely undesirable does not constitute constructive demotion if the duties are not of a sort normally given to a lower rank. *See id.*; *Lane v. Bonin*, 772 F. Supp. 2d 678, 691 (W.D. Pa. 2011) (noting further that less flexibility in taking time off and choosing shifts cannot indicate constructive reduction in rank). Loss of overtime opportunities is not a reduction in pay, and there is no right to overtime under the Police Tenure Act, 53 P.S. §811 *et seq.*, which is the source of property interests in police employment. *See Guarnieri v. Duryea Borough*, 3:05-CV-1422, 2007 WL 4085563 (M.D. Pa. Nov. 15, 2007).

In terms of constructive demotion, all Plaintiff has added beyond the previous version of his complaint are assertions that assignment to the K-9 unit carries greater

---

[4] Judge Stengel also found that Plaintiff did indeed receive due process because he failed to allege that Defendants interfered with the available grievance procedures. Painstaking parsing of the second amended complaint seems to reveal an allegation that Defendants' failure to formally close the dog-donation investigation prevented Plaintiff from utilizing the grievance procedures. The Court need not reach the issue because Plaintiff still fails to allege deprivation of a property interest through constructive demotion.

opportunities for overtime and training. Second Amended Complaint at ¶77. There is no right to overtime opportunities; therefore, loss of such opportunities cannot be a deprivation of a property interest. Further, access to those opportunities is, by Plaintiff's own account, a feature of the particular assignment rather than a feature of rank; the same is true for the additional training. As common sense suggests and Plaintiff states, K-9 officers have special training requirements. Plaintiff has not alleged that the differences between his opportunities and duties on and off the K-9 unit are akin to differences in rank.

Plaintiff makes a separate, disjointed attempt to demonstrate deprivation of a property interest on a failure to promote theory. Neither party addresses the issue in the briefs. Plaintiff alleges that "the department willfully changed their policy regarding supervisors in the K-9 unit to avoid promoting Plaintiff to Sergeant." Second Amended Complaint at ¶76. But there is no entitlement to a promotion if it is not promised or actually mandated by a rule. *See Vaticano v. Twp. of Edison*, 09-01751, 2010 WL 4628296 (D.N.J. Nov. 5, 2010), *aff'd*, 514 F. App'x 218 (3d Cir. 2013); *see also Newark Branch, NAACP v. Harrison*, 940 F.2d 792, 811 (3d Cir.1991) (finding no entitlement to promotion); *Pollock v. City of Ocean City*, 968 F. Supp. 187, 190 (D.N.J. 1997) (finding no property interest in promotion despite scores on civil service exam). And even an entitlement based on a rule dissolves if the rule is properly changed. *See Vaticano*, 2010 WL 4628296 at *11 ("Moreover, that ordinance was duly amended by a majority of the Township's council; thus, Plaintiff cannot use it as a basis to show entitlement."). The legal issue is almost beside the point because the facts Plaintiff lays out do not produce a sensible claim. Plaintiff seems to allege two separate policy changes, one in September

2010 and one in early 2011, but does not make clear how the policy actually changed. Neither of the policy documents attached as exhibits lists any rank requirement for the K-9 supervisor position. Plaintiff implies the policy formerly required the supervisor to be a sergeant and that it was changed so that he could be in charge without being promoted to sergeant. But both memos regarding supervision of the unit indicate not only that Plaintiff was *not* the unit supervisor, but that the actual supervisor held the rank of captain. Relaxing the rules to avoid promoting Plaintiff while allowing him to supervise the unit is unnecessary and makes no sense if the solution actually adopted was to put someone other than Plaintiff (of higher than sergeant rank, no less) in charge of the unit.

Plaintiff has not successfully alleged deprivation of a property interest, and especially given the meager additions in the second amended complaint as compared with its predecessor, he will be unable to do so. Further amendment would, therefore, be futile, and Count II will be dismissed with prejudice.

Count III

Plaintiff's third claim alleges violation of §504 of the RA and is framed primarily as an RA discrimination claim. The basic test for RA discrimination requires a plaintiff to show "(1) that he or she has a disability; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." *Wishkin v. Potter*, 476 F.3d 180, 184-85 (3d Cir. 2007). An alternate version of the third element requires an "adverse employment action." *See Terry v. Town of Morristown*, 446 F. App'x 457, 461 (3d Cir. 2011). Plaintiff's contention that

his reassignment demonstrates discrimination completely collapses in consideration of the timeline of his allegations. His medical issues did not begin until June 4, 2011, but he was relieved of his normal K-9 duties in January and formally reassigned in March (according to Defendants) or late May (according to Plaintiff). By his own account, he was put on night shifts in his new unit on June 1. Thus his reassignment was complete in every respect before his disability issues arose, and his RA discrimination claim is unsupported by any adverse employment action.[5]

Though the discrimination claim fails, a generous reading of Plaintiff's Count III could include an RA failure to accommodate claim. *See Fuller v. Geithner*, 09-2216, 2011 WL 710222 (E.D. Pa. Feb. 28, 2011) (explaining that failure to accommodate is a separate claim from RA discrimination) (citing *Barclay v. Amtrak*, 240 F. App'x 505, 508 (3d Cir.2007)). Plaintiff's need to work day shifts was accommodated about two months after his formal request. Though not alleged with sufficient clarity in the current second amended complaint, it is possible a legitimate failure to accommodate claim could be maintained based on the delay in providing the shift switch. *See Stadtmiller v. UPMC Health Plan, Inc.*, 799 F. Supp. 2d 492, 512 (W.D. Pa. 2011) (suggesting a claim for delay in accommodation would be viable if not countered by the plaintiff's own delay), *aff'd*, 491 F. App'x 334 (3d Cir. 2012); *O'Dell v. Dep't of Pub. Welfare of Pa.*, 346 F. Supp. 2d 774, 786 (W.D. Pa. 2004) (stating, where there was a dispute as to responsibility for a sixteen-month delay, that "although the Court recognizes that the

---

[5] Although Plaintiff's Count III (along with the section of his brief covering that claim) refers only to his reassignment, several other potential adverse actions are raised in the retaliation context under Count IV. Adverse action in the retaliation context is broader. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"). This opinion addresses and rejects the other possible adverse actions, even under the retaliation analysis, in the next section.

Plaintiff was ultimately provided reasonable accommodation," there was "a genuine issue of material fact regarding good faith effort on the part of the Defendant").

Plaintiff's Count III is inartfully drafted, only obliquely referencing delay, focusing on a discrimination theory, and dragging in unrelated and nonsensical issues such as being pushed out of the K-9 unit (which by Plaintiff's own averments happened before the disability issue even arose). Because of this confusion, and because the claim is primarily about discrimination without alleging any adverse employment action, Count III will be dismissed. Nevertheless, the count is broadly framed as a claim for violation of the RA, and a valid failure to accommodate claim may exist, so the dismissal is without prejudice.

<u>Count IV</u>

A prima facie case of retaliation under the RA requires: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002); *see also Kendall v. Postmaster Gen. of U.S.*, 13-1229, 2013 WL 5663872 (3d Cir. Oct. 18, 2013).

Defendants do not appear to contest the first element. There may be some dispute about the third element, but the Court finds the allegations sufficient at this stage because a plaintiff may demonstrate the causal connection by showing "(1) a temporal proximity between the two events that is 'unusually suggestive' of retaliation, or (2) timing plus other evidence, such as evidence that the employer engaged in a 'pattern of antagonism'

with the plaintiff." *Boandl v. Geithner*, 752 F. Supp. 2d 540, 562 (E.D. Pa. 2010) (citing *Luckiewicz v. Potter*, 670 F.Supp.2d 400, 411 (E.D. Pa. 2009)). While the timing aspect is less solid than it might be, Plaintiff's averments regarding the various statements by Chief MacLean indicate antagonism and an explicit distaste for providing accommodations.

The problem for Plaintiff's claim is the requirement of an adverse action. The only alleged consequences that occurred contemporaneously with or subsequent to the request for medical accommodation are the chief's derogatory comments, the later internal affairs investigation regarding supplemental outside work, and the chief's disclosure to third parties of Plaintiff's medical situation. As Judge Stengel's prior opinion found, Plaintiff has failed to allege any injury or harm based on Chief MacLean's comments that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted).

Nor do investigations, considered separately from any negative consequences thereof, generally constitute adverse employment actions. *See Boandl*, 752 F. Supp. 2d at 564 (finding no adverse action where an IRS employee was referred for investigation for potentially violating guidelines, the investigation was conducted, and a report was issued, but the investigation did not result in any consequences); *Dodd v. SEPTA*, 06-4213, 2008 WL 2902618 (E.D. Pa. July 24, 2008) ("the internal affairs investigation does not constitute an adverse employment action . . . the investigation alone is nothing more than what is to be expected following allegations of institutional misconduct"). Here, the investigation that occurred after Plaintiff's disability accommodation request concerned

potential violation of the rules on outside employment. Investigation related to enforcement of existing policy is to be expected, and Plaintiff has not alleged any harm that resulted from the investigation, so it does not constitute an adverse action.

No Third Circuit case appears to consider whether disclosure of confidential medical records qualifies as an adverse employment action for retaliation purposes, but other courts have answered in the negative. *See Wilson v. Memphis Light, Gas & Water*, 12-2956-STA-TMP, 2013 WL 4782379 (W.D. Tenn. Sept. 5, 2013) ("Plaintiff has not alleged how providing medical records to the DOL constitutes an employment action, or was 'materially adverse' to him. Thus, even accepting plaintiff's allegations as true, plaintiff has failed to sufficiently plead an adverse employment action by the defendants."); *Dennis v. Potter*, 1:08-CV-198-TLS, 2012 WL 8251513 (N.D. Ind. Mar. 23, 2012) ("Neither the Plaintiff's claim that her medical information was left on the copy machine for 30 minutes nor her claim that she was investigated for insubordination would dissuade a reasonable employee from engaging in Title VII protected activity, and therefore neither claim constitutes a materially adverse action under Title VII."). *But see Fay v. Costco Wholesale Corp.*, EDCV 10-00834 DDP, 2012 WL 683176 (C.D. Cal. Mar. 2, 2012) (noting that "one employee disclosing another employee's medical records might constitute an adverse employment action under certain circumstances" but finding no adverse action because the timing foreclosed any causal linkage). Plaintiff in the present case has not alleged any harm as a result of the extremely minimal and general disclosure of his medical issues. In fact, the disclosures he complains of seem to have involved Chief MacLean discussing Plaintiff's accommodation request either with attorneys, as was inevitable, or with Plaintiff's ex-girlfriend, who appears to have

cooperated with Plaintiff in bringing this suit. These are not circumstances under which the disclosures constitute substantial, injury-causing, adverse action.[6]

Because Plaintiff has not sufficiently alleged any adverse action subsequent to his medical accommodation request, and because the retaliation claim relies largely on allegations retained from the previously dismissed version of the complaint, Count IV will be dismissed with prejudice.

---

[6] Plaintiff flatly alleges Defendant(s) "divulge[ed] confidential medical information . . . to the general public," but backs up that statement with reference to a series of text messages from MacLean to Cori Doughty, Plaintiff's apparent ex-girlfriend who provided a verification with the complaint, and a single dinner conversation among MacLean, Doughty, and one additional person.